RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0159p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

FREDERICK C. BOWERMAN, et al.,

*Plaintiffs*,

EARL W. BURKHOLDER, JR., aka Earl W.
Buckholder, Jr.; HAROLD COOK; LAWRENCE
S. FOX; JAMES GARN; DAVID C. GRABOWSKI;
THOMAS GREGORY; RALPH MIKOLAJEZYK;
RICHARD MIKOLAJEZYK; MICHAEL F.
MILLER; JACK D. PATTERSON; WILLIAM L.
PEARSALL; DANNY C. PENN; GORDON T.
STAHL; CHARLES W. BENDER; HERBERT W.
BIDDLE; FRANK BOBROSKI; KEITH BRUNS;
DENNIS E. DALMAN; ROBERT E. DURELL;
JAMES DUSSEAU; WILLIAM HAMILTON;
ROGER HOFFMAN; DANIEL KLIMEK;
KENNETH L. MCKENZIE; MICHAEL J. NOWAK;
GARY K. RICHARDSON; THOMAS E.
RUTHERFORD; EDWARD SADOWY; EDWARD
L. SEEL; DAVE SMITH; DENNIS STEPHENSON;
WILLIAM T. STROUD; DANIEL TAYLOR;
RICHARD TENNEY; CHARLES E. VAN
WASSHNOVA; FRANK VITALE; JEFF
VOGELSANG; WILLIAM WOODWARD; RICK
BUNGE; DAVE DILLON; ESTILL JOHNSON;
TIMOTHY M. KRAFT; GERALD W. HEARST;
NICHOLAS HARTMAN; DANIEL L.
GERSCHUTZ; ALLEN BROSE; PETE W. LEE;
THOMAS R. CHROMIK; RON SUMNER; REX
MAZE; WILLIAM HAMEISTER; and RAYMOND
T. KLAWITTER,

*Plaintiffs-Appellants,*

*v.*

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA, Local No. 12; INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS

No. 10-3500

OF AMERICA; DAIMLER CHRYSLER
CORPORATION; and CHRYSLER GROUP,
L.L.C.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 02-07422—James G. Carr, District Judge.

Argued:  April 22, 2011

Decided and Filed:  June 21, 2011

Before:  NORRIS, ROGERS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Thomas A. Sobecki, Toledo, Ohio, for Appellants.  Thomas J. Gibney, EASTMAN & SMITH LTD., Toledo, Ohio, Joan Torzewski, HARRIS RENY TORZEWSKI, L.P.A., Toledo, Ohio, for Appellees. **ON BRIEF:** Thomas A. Sobecki, Toledo, Ohio, for Appellants.  John T. Landwehr, EASTMAN & SMITH LTD., Toledo, Ohio, Joan Torzewski, HARRIS RENY TORZEWSKI, L.P.A., Toledo, Ohio, for Appellees.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.  Plaintiffs-appellants are machine repairmen presently or formerly employed by Chrysler Group, L.L.C. or Daimler Chrysler Corporation ("Chrysler") at two plants located in Toledo, Ohio.  Plaintiffs claim that their union, defendants-appellees International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local No. 12 ("Local 12"),[1] breached their duty of fair representation by favoring certain skilled workers – millwrights and electricians – over plaintiffs – machine repairmen.

_____

[1]Defendants-appellees Daimler Chrysler Corporation and Chrysler Group, L.L.C. are parties to this lawsuit for purposes of necessary relief only.

In October 2007, the district court granted defendants' motion for summary judgment, holding that plaintiffs had failed to exhaust internal union remedies. On appeal, this court reversed, instructing the district court to consider whether plaintiffs' claims were barred by the statute of limitations. On remand, defendants again moved for summary judgment. The district court granted the motion, holding that a portion of plaintiffs' claims were barred by the statute of limitations and that the remaining claims failed on their merits. On appeal, plaintiffs challenge both of these findings. Upon review, we affirm the district court in all respects.

I.

Chrysler employs several kinds of skilled tradesmen at two Toledo plants, the "North Cove" plant and the new "Toledo North" plant. This case implicates three groups of skilled tradesmen: machine repairmen, millwrights, and electricians. Plaintiffs are machine repairmen.

Until 1997, the skilled tradesmen at Chrysler's Toledo plants were represented by two unions. The UAW represented, among others, millwrights and electricians, and the Mechanics Education Society of America ("MESA") represented the machine repairmen. In 1997, former MESA members became UAW members subject to the new 1997-2002 collective bargaining agreement ("CBA").

In 1999, when Chrysler built the Toledo North plant, problems developed in establishing its "lines of demarcation," which delineate what responsibilities are assigned to each skilled trade. Disputes over lines of demarcation were not an unusual occurrence at the Chrysler plants. In particular, millwrights, electricians, and machine repairmen have some overlap with regard to their trade skills,[2] resulting in disputes over work assignments. However, the lines of demarcation at the North Cove plant became well-settled over time.

---

[2]Indeed, the most recent negotiations between the UAW and Chrysler will result in the combination of the millwright and machine repair trades into one larger trade designation: "mechanical technician."

Before 1997, line of demarcation disputes were resolved through the grievance process by relying in substantial part on past practice. However, the 1997-2002 CBA provided for several changes. Emphasizing the need for a cooperative work environment, the CBA noted that there must be "flexibility in job assignments and job transfers[.]" Specifically addressing the issue of lines of demarcation, the CBA provided: "Skilled Trades classification shall be effectively reduced to reflect the consolidation of former M.E.S.A. classifications with UAW, Local 12 in addition to minimizing traditional lines of demarcation with respect to job responsibilities." The CBA further noted that "many tasks are properly performed within the scope of two or more classifications."

In August 1999, before the Toledo North plant began operations, certain specifically assigned coordinators, along with maintenance manager Ted Roberts, attempted to establish lines of demarcation for the plant. This process resulted in numerous disagreements, causing concern among the skilled tradesmen.

In January 2001, Local 12 announced the creation of a Lines of Demarcation Committee (the "LDC") to draft the lines of demarcation for the Toledo North plant. Representatives from each skilled trade were elected, establishing the LDC by January 30, 2001.[3] Thereafter, the LDC viewed plant equipment, conducted meetings, and voted on the lines of demarcation. Eight trades were represented on the LDC, each with one vote. Richard McIntyre, Jeffrey Ghigo, Gary Soncrant, and Bill Hameister each served, in succession, as LDC members representing the machine repairmen. The decisions of the LDC, numbered 1-10, with one unnumbered decision and one clarification decision, were issued between June 5, 2001, and May 31, 2002.

Following publication of the LDC decisions, many skilled tradesmen were left dissatisfied. As a result, a petition was circulated requesting that the UAW visit the Toledo North plant and make recommendations regarding appropriate lines of

---

[3]Around this same time period, Chrysler discontinued production of the Jeep Cherokee and significantly reduced the production volume of Jeep Wranglers. This resulted in significant layoffs from August 2001 until August 2002.

demarcation. In accordance with this request, Jerry Brown, a staff representative for the UAW, visited the Toledo North plant on three occasions. Brown examined the disputed areas of the plant and provided written recommendations. However, several skilled tradesmen were still dissatisfied with these recommendations, resulting in inconsistent job allocations and grievances.

In 2003, Local 12 and Chrysler negotiated a new CBA. During negotiations, it became clear that the lines of demarcation issue needed to be resolved. Accordingly, a letter agreement was drafted providing that a joint task force would be created to address work assignments. Dan Henneman, the Local 12 chairman, assigned Fritz Edwards, the skilled trades committeeman, to work with Chrysler to establish mutually agreed upon lines of demarcation. Edwards thereafter called a meeting with the skilled trade stewards to discuss the issue. Richard McIntyre, the machine repair steward, attended the meeting, but left early when frustrated with the meeting's progress. Another meeting was scheduled, but McIntyre was unable to attend. Following these failed meeting attempts, Edwards continued his work on the lines of demarcation without input from the stewards, obtaining information from skilled tradesmen on the plant floor, center managers Chuck Velez and Bill Beeker, and from personal observation.

When Edwards' lines of demarcation were published in 2005, no one was completely satisfied. Several machine repairmen felt that the demarcations reassigned significant portions of their work to millwrights and electricians. Such reassignments, they felt, were contrary to past practice and training.

Plaintiffs filed the present lawsuit on August 26, 2002, alleging that Local 12 and the UAW used their influence to favor millwrights and electricians at the expense of the machine repairmen. They also contended that the creation of the LDC was not authorized by the union bylaws or constitution.

On May 19, 2006, defendants moved for summary judgment on numerous grounds. The district court granted defendants' motion, holding that plaintiffs failed to exhaust internal union remedies. On appeal, we reversed the grant of summary judgment, holding that the district court had failed to address "a threshold statute of

limitations issue that could render the case untimely." *Burkholder v. UAW*, 299 F. App'x 531, 534 (6th Cir. 2008) (unpublished). In addition, we held that the district court had not addressed whether the exhaustion of internal remedies would be excused as a result of the union's alleged breach of its duty of fair representation. *Id.* at 535-36 (citing *Williams v. Molpus*, 171 F.3d 360, 369 (6th Cir. 1999)).[4]

Upon remand, defendants once again moved for summary judgment, asserting that a majority of plaintiffs' claims were barred by the statute of limitations. Additionally, defendants asserted that plaintiffs' claims failed on their merits. On March 19, 2010, the district court granted defendants' motion, holding that several of plaintiffs' claims were barred by the statute of limitations and that all remaining claims failed on their merits. Plaintiffs thereafter filed this timely appeal.

## II.

We review de novo a district court's grant of summary judgment. *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether the movant has met this burden, we view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

## III.

The first issue is whether plaintiffs' claims pertaining to LDC decisions and layoffs made before February 26, 2002, are barred by the statute of limitations. In *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983), "the Supreme Court established a six-month period of limitations for claims alleging breach of [the] duty of fair representation[.]" *Ratkosky v. United Transp. Union*, 843 F.2d 869,

---

[4]The holding of *Molpus*, relied upon by this court in reversing the district court's grant of summary judgment, is currently the subject of *en banc* review in *Chapman v. UAW Local 1005,* No. 10-3616 (6th Cir. filed May 14, 2010).

873 (6th Cir. 1988).  "As a general rule, the limitations period begins to run when the potential plaintiff 'knows or should have known of the union's alleged breach of its duty of fair representation.'" *Id.* (quoting *Dowty v. Pioneer Rural Electric Co-Op., Inc.*, 770 F.2d 52, 56 (6th Cir.), *cert. denied*, 474 U.S. 1021 (1985)).  In this case, because plaintiffs filed suit on August 26, 2002, the district court held that claims pertaining to LDC decisions and layoffs finalized before February 26, 2002, were barred by the statute of limitations.  We agree.

In asserting that they may rely upon all of the LDC decisions to support their fair representation claim, plaintiffs contend that such decisions constitute a "continuing violation."  When a continuing violation is found, "a plaintiff is entitled to have the court consider all relevant actions allegedly taken pursuant to the [wrongful] policy or practice, including those that would otherwise be time barred."  *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (internal quotation marks and citation omitted).  This court most commonly applies the continuing-violation doctrine in Title VII cases, *id.*, but has considered applying it to claims under § 1983, *see, e.g.*, *Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934, 940-41 (6th Cir. 1999), and the Age Discrimination in Employment Act, *see e.g.*, *Sherman v. Chrysler Corp.*, 47 F. App'x 716, 721 (6th Cir. 2002) (unpublished).  We assume for purposes of argument that this doctrine could also be applied to a fair representation claim.  *See Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1000-01 (6th Cir. 1994).

This court recognizes two categories of continuing violation.  The first is "where the plaintiff can show prior [wrongful] activity that continues into the present," and the second is "where the plaintiff can show a longstanding and demonstrable policy of discrimination."  *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (internal quotation marks and citation omitted).  In this case, plaintiffs do not assert that the statute of limitations should be tolled under the second continuing-violation category.  Accordingly, we will not address it.

Under the first category, "plaintiffs are . . . precluded from establishing a continuing violation exception by proof that the alleged [wrongful] acts . . . occurring

prior to the limitations period are sufficiently related to those occurring within the limitations period." *Sharpe*, 319 F.3d at 268 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). Thus, "discrete acts of which [the plaintiffs were] immediately aware when they occurred," *Bell*, 351 F.3d at 248, such as "termination, failure to promote, denial of transfer, [and] refusal to hire," do not constitute a continuing violation. *Morgan*, 536 U.S. at 114.

In the case at bar, plaintiffs rely on numerous discrete occurrences of which they were immediately aware: the issuance of the LDC decisions. Each decision set forth a set of demarcations providing what skilled trades would perform what jobs in different areas of the Toledo North plant. Thus, each LDC decision was discrete and potentially actionable. *See Lyons v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 09-6084, 2011 WL 1042271, at *7 (6th Cir. Mar. 22, 2011) (unpublished) (noting that a series of "discrete" acts with "discrete consequences" does not constitute a continuing violation). Indeed, the heart of plaintiffs' claim is that Local 12 violated its fair representation duty when it transferred work away from the machine repairmen without a rational basis. Accordingly, if plaintiffs' assertions are true, there was no barrier to filing suit after the first LDC decision was published that allegedly transferred work away from plaintiffs without reason.[5]

While plaintiffs contend that they "had no way to know that [the first LDC decision] was the first of a string of decisions that would cumulatively transfer a large body of work from machine repairmen to millwrights and electricians[,]" plaintiffs did not need to know the *extent* of the alleged breach of the duty of fair representation to file a claim. If Local 12 transferred a small amount of work away from the machine repairmen in a fashion that was improperly discriminatory, in bad faith, or arbitrary, there is no reason such an occurrence would not be actionable. *See Vaca v. Sipes*, 386 U.S. 171, 190 (1967) ("A breach of the statutory duty of fair representation occurs only

---

[5]Plaintiffs rely on *Lewis v. Local Union No. 100 of the Laborers' International Union of North America, AFL-CIO*, which applied the continuing-violation doctrine to a fair representation claim. 750 F.2d 1368, 1379 (7th Cir. 1984). However, this case was decided prior to *Morgan*, which imposed the "discrete acts" rule that is dispositive in this case.

when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."). Moreover, ten of the twelve LDC decisions occurred prior to February 26, 2002. Thus, plaintiffs cannot (and do not) claim that they were not aware of a significant number of job transfers prior to that date. *See Ratkosky*, 843 F.2d at 873 (internal quotation marks and citation omitted) ("As a general rule, the limitations period begins to run when the potential plaintiff knows or should have known of the union's alleged breach of its duty of fair representation."). Accordingly, because the LDC decisions issued before February 26, 2002, are discrete and potentially actionable events, there is no continuing violation. These decisions are barred by the statute of limitations.[6]

### IV.

### A.

The next issue is whether Local 12 violated its duty of fair representation by favoring the millwrights and electricians, over plaintiffs, machine repairmen. Primarily, plaintiffs contend that the union wrongfully favored the millwrights and electricians by transferring substantial amounts of work through the lines of demarcation provided by the LDC in 2001 and 2002, and by Edwards in 2005. In addition, plaintiffs contend that the union favored the electricians and millwrights in the areas of cross-training, apprenticeship training, and "job bank" opportunities.

In *Vaca v. Sipes*, the Supreme Court held that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." 386 U.S. at 190. A union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65,

---

[6]Plaintiffs also assert that the continuing-violation doctrine applies to layoffs that occurred before February 26, 2002. For the same reasons described above, plaintiffs are incorrect. The Supreme Court in *Morgan* expressly noted that a "termination" is a discrete act that does not constitute a continuing violation. 536 U.S. at 114. The same is true with regard to plaintiffs' claims regarding the *establishment* of the LDC, which is a discrete act taking place outside the limitations period.

67 (1991) (internal quotation marks and citation omitted). Accordingly, a union's judgments are not arbitrary "even if those judgments are ultimately wrong," *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (1998), negligent or mistaken, *Poole v. Budd Co.*, 706 F.2d 181, 183 (6th Cir. 1983).

A union's actions are improperly discriminatory if they are "intentional, severe, and unrelated to legitimate union objectives[,]" *Amalgamated Ass'n of St., Elec., Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971), and they are in bad faith if made with improper intent or motive, *Williamson v. Lear Corp.*, 183 F. App'x 497, 505 (6th Cir. 2006) (unpublished). In addition, to recover for a breach of the duty of fair representation, the plaintiff must demonstrate injury. *See Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998); *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 585 (6th Cir. 1994) (noting that a union's failure to present favorable evidence during a grievance procedure is actionable only if such evidence would have brought about a different result).

B.

Here, plaintiffs assert that the union had a *more demanding* duty of fair representation regarding the lines of demarcation because it was acting as a "hiring hall." In making this argument, plaintiffs rely on language contained in *Breininger v. Sheet Metal Workers International Association Local Union No. 6*, 493 U.S. 67 (1989).

In *Breininger*, the Supreme Court addressed the duty of fair representation in the context of a union-run hiring hall. 493 U.S. at 70. Plaintiffs claimed that the union breached its duty of fair representation by exercising, in an improper discriminatory manner, its ability to refer union members for employment. *Id.* at 70-71. In defending against this claim, the union asserted that when it operates a hiring hall, it "should be relieved entirely of its duty of fair representation." *Id.* at 87. The Court rejected this argument, holding that the duty of fair representation applies to union-run hiring halls, and noting that "if a union does wield additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly *increases* rather than *decreases*." *Id.* at 89 (emphasis in original).

Citing *Breininger*, both the D.C. and Ninth Circuits have held that a more demanding duty of fair representation is required in the hiring-hall context. *Lucas v. NLRB*, 333 F.3d 927, 934-35 (9th Cir. 2003); *Jacoby v. NLRB*, 233 F.3d 611, 616-17 (D.C. Cir. 2000). However, a panel of this court has held to the contrary. In *Hoskins v. Local 1853 International Union, United Auto, Aerospace and Agricultural Implement Workers of America*, 188 F.3d 507, 1999 WL 618074 (6th Cir. 1999) (unpublished), union members asserted that *Breininger* required "a higher duty of fair representation" for unions running a hiring hall. 1999 WL 618074, at *4. In rejecting this argument, the *Hoskins* court held that the Supreme Court in *Breininger* "did not impose a higher duty of fair representation[,]" but merely held that the duty was applicable to union-run hiring halls. *Id.*

We need not decide whether *Breininger* requires a higher duty of fair representation in the hiring-hall context because Local 12 was not running a hiring hall. In *Breininger*, the union ran an exclusive hiring hall over which the employer had no authority or responsibility. 493 U.S. at 71 n.1. The same was true in *Lucas* and *Jacoby*. *See Lucas*, 333 F.3d at 929 n.2; *Jacoby*, 233 F.3d at 613. In contrast, the union in this case was merely designating which skilled trades were to perform what work at the Toledo North plant, a decision subject to Chrysler's ultimate approval. The union was not selecting individual union members for employment. Thus, because the union was not operating a hiring hall, a higher duty of fair representation is not required.

## C.

Having determined that *Breininger* does not impose a higher standard in this case, we now move to the merits of the claim. In asserting that Local 12 breached its duty of fair representation through setting the lines of demarcation, plaintiffs rely exclusively on their assertion that the lines of demarcation were made without reason and in contrast to prior practice and training, thereby rendering them arbitrary.[7]

---

[7]While plaintiffs assert that the union's lines of demarcation were so arbitrary as to demonstrate discrimination and bad faith, plaintiffs do not put forth any arguments or evidence demonstrating the bad faith or discriminatory intent of the union.

However, plaintiffs must demonstrate that the union's actions were wholly "irrational" in order to establish arbitrariness, a demanding standard.  Because plaintiffs have failed to submit evidence demonstrating that the lines of demarcation were "so far outside a wide range of reasonableness as to be irrational[,]" *O'Neill,* 499 U.S. at 67 (internal quotation marks and citation omitted), we affirm the district court's dismissal of this claim.

As a practical matter, unions are rarely able to negotiate agreements that completely satisfy the desires of all its represented members.  Indeed, as the Supreme Court has noted:

> Inevitably differences arise in the manner and degree to which the terms of any . . . agreement affect individual employees and classes of employees.  The mere existence of such differences does not make them invalid.  The complete satisfaction of all who are represented is hardly to be expected.  A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

*Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953).  Accordingly, we "are careful not to substitute [our] judgment[] for those of the authorized labor organization." *Ratkosky*, 843 F.2d at 876.  In this case, plaintiffs do not dispute that there is no one "correct" set of demarcations that would be agreeable to all skilled tradesmen.  Accordingly, we will not disturb the union's proper exercise of its discretionary judgment.  The fact that the lines of demarcation "favor[] one group more than another does not in itself constitute a breach of the union's duty." *Id.*

Plaintiffs rely upon "past practice" and prior training at the North Cove plant in asserting that the lines of demarcation at the Toledo North plant are arbitrary.  However, plaintiffs acknowledge that the concept of past practice is elusive, as the skilled tradesmen are often unable to agree on what constitutes past practice.  Indeed, many jobs were shared by multiple skilled trades at the North Cove plant.  Moreover, the 1997-2002 CBA provided for the minimization of traditional lines of demarcation, recognizing that many jobs are properly performed by two or more trade classifications.  Thus, while

past practice and training may not have been emphasized as desired by plaintiffs, this fact alone does not render the demarcations irrational in light of the circumstances presented in setting lines of demarcation for a new plant under a new CBA.

Plaintiffs further contend that the demarcations established in the Toledo North plant are arbitrary because of the sheer *amount* of transferred work. However, the fact that the demarcations are more favorable to the electricians and millwrights is not enough to establish a breach of the duty of fair representation. *See Ratkosky*, 843 F.2d at 876. Plaintiffs' emphasis on the *end result* of the long-fought battle over the lines of demarcation pays short shrift to the process through which the demarcations were made. This process is highly relevant to whether Local 12 violated its duty of fair representation. *See O'Neill*, 499 U.S. at 78 (holding that courts must "take into account . . . the facts and the legal climate that confronted the [union] at the time the decision was made"). The undisputed facts establish that after the skilled tradesmen were dissatisfied with the proposed allocation of work at the Toledo North plant, a committee was elected to make recommendations based upon majority vote. When several skilled tradesmen were still dissatisfied, a UAW representative was brought to the plant to provide recommendations, and when the skilled tradesmen were yet still dissatisfied, Local 12 assigned Edwards to create new lines of demarcation. Thus, while no process resulted in a set of demarcations agreeable to all union members, the process itself was reasonably fair, and certainly not irrational.[8]

Moreover, while plaintiffs claim that a significant number of machine repairmen jobs were unreasonably transferred to millwrights and electricians, plaintiffs fail to *quantify* this transfer for the court. Plaintiffs cannot rely on the cumulative effect of the line of demarcation decisions as evidence of arbitrariness without submitting evidence establishing that effect. Mere conclusory statements that the machine repair trade was "gutted" is insufficient to satisfy plaintiffs' burden of establishing arbitrariness. *See*

---

[8]Plaintiffs present several criticisms regarding the processes that resulted in the lines of demarcation, not the least of which is Edwards' refusal to consider McIntyre's opinions regarding the 2005 demarcations. While perhaps it is unfortunate that the skilled trade stewards were not more involved in the setting of the lines of demarcation, this failure does not render the demarcations irrational.

*Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991) (stating that conclusory statements are insufficient to meet the burden of production and persuasion).

Finally, while plaintiffs contend that the lines of demarcation were made without explanation, the record indicates to the contrary. For example, the LDC assessed pieces of equipment in the Toledo North plant, debated which trade should rightfully perform the work, and then determined the lines of demarcation by majority vote. While neither party sets forth in the record the precise issues debated before the vote, there is no evidence establishing that the reasons underlying the majority vote were irrational. From what can be gleaned from the record, it appears that some work was transferred from machine repairmen to millwrights because the work required more than one employee, necessitated "rigging," or because the work involved "rollers." Moreover, while plaintiffs assert that the machine repairmen had superior training for the transferred positions, there is no evidence in the record indicating that the other skilled trades were unable to adequately perform the jobs to which they were assigned.

In sum, plaintiffs have failed to submit evidence demonstrating that Local 12's decisions regarding the lines of demarcation were irrational. The mere fact that plaintiffs "were adversely affected by the actions" does not establish a breach of the duty of fair representation. *Ratkosky*, 843 F.2d at 878-79.[9] Accordingly, we affirm the dismissal of plaintiffs' claim regarding the lines of demarcation.

V.

Plaintiffs place little emphasis on their remaining claims of unfair representation against Local 12. First, plaintiffs assert that Local 12 unfairly allocated cross-training opportunities. Chrysler approves voluntary training courses for its skilled tradesmen, designating what trades may attend what classes. When a class is not filled with employees of the designated trade, it is possible for other tradesmen to attend.

---

[9]In their reply brief, plaintiffs assert that Local 12 had a motive to transfer positions to the electricians and millwrights to protect them from layoffs at the expense of the machine repairmen. However, plaintiffs provide no citations to the record to support this theory of nefarious intent.

While the record indicates that millwrights and electricians were able to attend machine repair training courses, it does not appear that machine repairmen have been able to receive similar cross-training. However, there is no evidence indicating that millwrights and electricians were able to receive cross-training in violation of Chrysler rules, i.e., were able to attend classes already filled with employees of the designated trade. Moreover, there is no evidence indicating that machine repairmen were unable to attend classes designated for other trades when such classes were not full. In fact, there is nothing in the record showing that any plaintiff was ever denied requested cross-training. Thus, there is simply no evidence that the union acted in bad faith, with discriminatory intent, or irrationally with regard to cross-training.

Next, plaintiffs claim that Local 12 violated its duty of fair representation in denying machine repair apprentices nationally required training hours on "machining." Once again, this claim is without merit. The Toledo Chrysler plants do not require machine repairmen to perform machining work, and therefore denied apprenticeship hours in that area. However, apprentices were nevertheless able to complete their apprenticeships and obtain their journeyman cards. Accordingly, Local 12 was not irrational in denying such training, and even if it had been, plaintiffs cannot demonstrate the harm required to assert a claim for breach of the duty of fair representation.

Plaintiffs also argue that Local 12 violated its duty of fair representation by unfairly allocating "job bank" positions. We disagree. The job bank is a part of the Employment Security System provided under the CBA. Laid-off employees can be placed in the job bank and receive one hundred percent of their wages. Generally, employees must have three years of seniority to be eligible for the job bank. However, exceptions to this rule are made when community-related positions require certain skills.

Plaintiffs contend that while no machine repairmen with less than three years seniority were placed in the job bank, a small number of millwrights and electricians without the requisite seniority did receive job bank positions. This discrepancy is reasonably explained, however, as a small number of millwrights and electricians were paid out of the job bank, despite their lack of seniority, because certain community-based

projects required their skills.  Plaintiffs have put forth no evidence contradicting this explanation.  Accordingly, the union's actions were not irrational, discriminatory, or made in bad faith.

## VI.

Finally, plaintiffs assert that the UAW breached its duty of fair representation in providing recommendations regarding the lines of demarcation for the Toledo North plant.  However, as described above, the UAW visited the Toledo North plant, reviewed the disputed positions, and made advisory recommendations.  There is no evidence indicating that these actions were improperly discriminatory, made in bad faith, or arbitrary.

## VII.

In sum, we hold that plaintiffs' claims regarding the LDC decisions and layoffs made before February 26, 2002, are barred by the statute of limitations.  In addition, we hold that plaintiffs' remaining claims fail on their merits.  Accordingly, we affirm the judgment of the district court.