**BIG CHIEF DRILLING COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 118–86 C.

United States Claims Court.

June 9, 1988.

Wesley C. Fredenburg, Oklahoma City, Okl., for plaintiff; Andrew M. Coats, of counsel.

E. Kathleen Shahan, Washington, D.C., with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, Director, and Thomas W. Peterson, Asst. Director, for defendant.

## OPINION

HORN, Judge.

This case is before the court on defendant's motion for summary judgment.[1]

Plaintiff, Big Chief Drilling Company (Big Chief), brought this action under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982). The jurisdiction of this court is uncontested under 41 U.S.C. § 609.

The complaint in this action was filed with the court on February 25, 1986. Plaintiff claims money damages resulting from the government's omissions and actions during contract performance. Defendant filed an answer in which it requested dismissal of the complaint and filed the instant motion for summary judgment. Oral argument was heard, after submission of briefs by both parties.

After consideration of the papers submitted by both parties and the arguments presented orally to the court, for the reasons stated below, defendant's motion for summary judgment is denied.

## Background

The facts of this case appear to be as follows. In December, 1982, the Department of Energy (DOE) issued an invitation for bids (No. DE–FB–96–83–P010872) for a fixed-price, construction contract. The project consisted of drilling ten wells at the DOE Strategic Petroleum Reserve's Big Hill, Oil Storage Facility in Jefferson County, Texas.

The Strategic Petroleum Reserve Project Management Office (SPRO) held a pre-bid conference on February 3, 1983, which representatives of Big Chief attended. The parties agree, and affidavits submitted by both parties confirm, that the bidders were informed at the pre-bid conference that the differing site conditions clause would be deleted from the proposed contract. The parties disagree, however, as to what else occurred regarding the deletion of the differing site conditions clause. Defendant claims that it informed the bidders at the conference, and confirmed in a subsequent letter to all bidders, that the deletion meant that the contractor would be responsible for all problems arising from unforeseen subsurface conditions, including lost circu-

---

1. This case was transferred to Judge Horn after the retirement of another Judge.

lation. Defendant concedes, however, that no copy of this letter can be located.

Conversely, plaintiff contends that the DOE did not inform bidders that the deletion of the differing site conditions clause would make the contractor responsible for costs associated with lost circulation. Moreover, plaintiff states that none of its officers recall receiving a letter from defendant as to its responsibilities in the absence of the clause.

The contract was awarded to Big Chief on March 22, 1983. Nine out of the ten wells were completed without incident. This action concerns well number 108A. Work began on well number 108A on June 17, 1983.

The parties agree that the depth to the top of the caprock, which was located on June 19, 1983, was approximately 352 feet from the surface. They disagree, however, as to who determined the location of the caprock, who had the duty to make that determination under the contract and whether the determination was proper. The parties also disagree as to who was to establish the appropriate placement for the 30–inch casing shoe. Thus, substantial disagreements appear to remain as to what occurred and as to who had the duty to make key determinations during contract formation and during performance.

Defendant states that on June 20, 1983, Big Chief reached a drilling depth of 382 feet. Defendant further states that sand fell into the well hole on June 21 and 22, 1983, while Big Chief was trying to install the 30–inch casing. Plaintiff does not disagree with these facts. However, the parties disagree as to the depth at which the 30–inch casing became stuck. Defendant says it stuck at a depth of 358 feet; plaintiff says it became stuck at a depth of 356 feet. The parties agree that the 30–inch casing was set and cemented successfully on June 23, 1983, at a depth of 365 feet.

Big Chief encountered lost circulation on June 28, 1983. The parties also disagree as to the depth at which lost circulation occurred. Defendant says it occurred between 688 and 815 feet; plaintiff says it occurred at a depth of 798 feet in a 12¼

inch hole. The parties also disagree about lost circulation in the 30–inch casing seat. Defendant contends that lost circulation in the vicinity of the casing seat first occurred on July 24, 1983. Plaintiff contends that it has never been established that lost circulation occurred at the 30–inch casing seat at all.

The parties agree that Big Chief performed a number of so-called "cement squeeze jobs," a procedure which plaintiff defines as one in which cement is forced down the well hole and behind the casing shoe to restore the shoe. They disagree, however, as to the reason for performing such cement squeeze jobs and they disagree as to when the jobs were performed. Defendant contends that plaintiff performed these measures in an effort to combat lost circulation, and that these measures were performed prior to July 24, 1983 and without consultation with DOE officials. Plaintiff contends that it performed the squeeze jobs to remedy the failure of the casing shoe and that the procedure began after the casing shoe was lost on July 21, 1983. According to plaintiff, the casing shoe was restored on August 13, 1983. Also according to plaintiff, it engaged in redrilling until August 27, 1987 when the depth previously obtained before the loss of the casing shoe was achieved. As a result, plaintiff states, it incurred substantial expenses and loss of rig time from July 2, 1983 to August 27, 1983.

The parties also disagree about the occurrence of a pressure test. Defendant contends that on August 20, 1983, Big Chief conducted a pressure test of the 30–inch casing and that the test indicated a significant loss of pressure. Plaintiff denies that any such pressure test was conducted. Both parties agree that drilling of the well was completed on October 23, 1983.

On December 4, 1983, Big Chief filed a claim with the DOE requesting reimbursement in the amount of $906,525.93. This claim, which related only to well number 108A, requested reimbursement for expenses incurred as a result of the loss of

the casing shoe and for expenses arising from lost circulation. Defendant contends that the December 4, 1983 claim constituted its first notice that plaintiff considered the government responsible for problems with well number 108A. Plaintiff, however, maintains that the government officials on the site were fully apprised of all the drilling activities, as well as other problems encountered at the site.

Based upon a meeting between the parties, on May 8, 1984, Big Chief submitted a revised claim on June 14, 1984. The resubmitted claim requested reimbursement in the amount of $646,801.77. This revised claim related only to the loss of the casing shoe and omitted the claim for lost circulation. Defendant contends that until June 14, 1984, it had no knowledge of any problems plaintiff had encountered with the casing shoe, and that the claim for reimbursement constituted a new theory for compensation. Plaintiff argues that defendant knew precisely what was occurring at the site, and, therefore, the casing shoe claim formed a proper basis to support its claim.

Defendant also argues to the court that had it been properly notified of problems at the site, it might have been able to take actions to mitigate potential damages. Plaintiff contends that defendant constantly monitored the drilling operations and, therefore, had the opportunity to question the actions taken by Big Chief and to suggest other actions.

On July 14, 1984, final payment on the contract was made and on April 1, 1985, the contracting officer issued a final decision, denying the contractor's claims for additional compensation. Big Chief filed its complaint in this court on February 25, 1986.

### Discussion

Rule 56 of the Rules of the United States Claims Court (RUSCC) and Rule 56 of the Federal Rules of Civil Procedure (Fed.R. Civ.P.) are similar in language. Indeed, Rule 56(c) of both rules provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Moreover, Rule 56(f) of the Rules of the United States Claims Court and Rule 56(e) of the Federal Rules of Civil Procedure both include a provision which reads:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, the moving party bears the initial burden of showing that there is no genuine issue of material fact. If the moving party fails to carry its burden, then the nonmoving party need not "come forward with suitable opposing affidavits." *Adickes v. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142 (1970); *see also Weide v. United States*, 4 Cl.Ct. 432, 435 (1984), *aff'd mem.*, 765 F.2d 157 (Fed.Cir.), *cert. denied*, 474 U.S. 822, 106 S.Ct. 74, 88 L.Ed.2d 61 (1985) (summary judgment appropriate only where there is no material issue of fact and moving party entitled to judgment as matter of law). If, however, the moving party carries its burden, then the nonmoving party must present "specific facts showing that there is a genuine issue for trial." RUSCC 56(f) and Fed.R. Civ.P. 56(e); *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1163 (Fed.Cir.1985). Any inferences "to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Gregory Lumber Co. v. United States*, 9 Cl.Ct. 503 (1986). According to *Adickes*, the nonmoving party must present materials showing that the

inferences to be drawn are susceptible to different interpretations. *Adickes*, 398 U.S. at 160 n. 22, 90 S.Ct. at 1610 n. 22 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968)); cf. *Crawford v. United States*, 3 Cl.Ct. 323 (1983), *aff'd mem.*, 732 F.2d 168 (Fed.Cir.), *cert. denied*, 469 U.S. 861, 105 S.Ct. 194, 83 L.Ed.2d 127 (1984) (mere hope that discovery may uncover some evidentiary basis for party's version of the facts not sufficient to preclude grant of summary judgment). For summary judgment to be denied, all that need be present is sufficient evidence of differences to support the need for factual dispute to be resolved by a judge. *First National Bank of Arizona*, 391 U.S. at 288–89, 88 S.Ct. at 1592.

In three relatively recent cases, the United States Supreme Court has refined the long standing summary judgment guidelines outlined above. *See generally Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 238 (1986).

 The moving party certainly retains the burden of first showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. However (especially where the nonmoving party will bear the burden of proof at trial on a dispositive issue), "the burden of the moving party may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. Moreover, it appears that where the nonmoving party will bear the burden of proof at trial on a certain issue, the moving party may rely on the pleadings, depositions, answers to interrogatories, and admissions on file, in support of its motion. The Supreme

Court has indicated that, contrary to then existing practice in many Federal courts, under its interpretation of Rule 56 Fed.R. Civ.P., the moving party in a summary judgment proceeding should not be required to present affidavits to support its motion regarding issues for which it does not bear the burden of proof at trial on the same issue. (See also RUSCC 56). The nonmoving party, on the other hand, may oppose the motion with depositions, answers to interrogatories and admissions on file, but may not rely on the "mere pleadings themselves." *Id.* at 324, 106 S.Ct. at 2554. Thus, if the moving party does not bear the burden of proof on the issues for trial, then its burden on a motion for summary judgment decreases, while the nonmoving party's burden on the same issues increases. In such a situation, the nonmoving party must produce enough evidence to show that a genuine factual dispute exists.[2]

In determining whether a genuine factual issue exists, the judge's "function is not himself [sic] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. Or as stated in a different way by the *Anderson* court, the standard is: "[w]hether the evidence presents a sufficient disagreement to require submission to a jury [or to a judge] or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. Moreover, the evidence will be viewed "through the prism of the substantive evidentiary burden." This means, for example, that if the substantive evidentiary burden at trial will be the "clear and convincing" standard, as it was in *Anderson*, then the clear and convincing standard applies to the motion for summary judgment. *Id.* at 252, 106 S.Ct. at 2512. *See also Matsushita*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 238.

The refined summary judgment standard, therefore, eases the burden of the moving party if it will not bear the burden

---

**2.** While the nonmoving party must rely on evidentiary material other than the pleadings themselves, the standard does not require that evidence conform to trial admissibility standards. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

of proof at trial, and requires that the nonmoving party produce evidence such that the finder of fact could reasonably find in its favor on the merits of the case. On the other hand, "where the record taken as a whole would not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'." *Matsushita* at 587, 106 S.Ct. at 1357 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 254, 88 S.Ct. 1575, 20 L.Ed.2d 569). If, in a plausible case, however, the nonmoving party produces sufficient evidence of disagreement, then the motion for summary judgment should be denied.

■ In the instant case, the parties even disagree as to how plaintiff's claim should be classified within government contract law. Plaintiff contends that the claim is a breach of contract claim based on a type of defective specification claim. Defendant argues in the alternative, that the claim should be considered a differing site conditions claim, but also argues its positions if the claim is classified as either a changes claim or a defective specifications claim.[3] We note, however, that no matter how the claim is classified, under each of the theories offered, it seems that the contractor has the burden of proof in order, ultimately, to recover. Although, the plaintiff appears to bear a heavy burden, the court cannot rule out the possibility of recovery.

■ In order to recover in the case, plaintiff will have to show a causal link between the damages claimed and the nature of the claim under which they are asserted. *See generally G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 686 n. 13 (1984). To recover under a changes clause, for either an express or constructive change, the contractor must show that a change occurred and that it was ordered by a government officer having the requisite authority. *See Shank–Artukovich v. United States*, 13 Cl.Ct. 346, 355 (1987). To recover under a type I differing site conditions claim, a contractor must prove that conditions actually encountered dif-

fered materially from those outlined in the contract. *See, Shank–Artukovich*, 13 Cl.Ct. at 350; *Foster Construction C.A. and Williams Brothers Co. v. United States*, 193 Ct.Cl. 587, 597, 435 F.2d 873 (1970); *Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl.Ct. 193 (1987). Moreover, where the government provides the contractor with performance specifications, as opposed to design specifications, the government does not warrant successful completion. *See Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 49 (1985), *aff'd*, 790 F.2d 90 (Fed.Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 53 (1986).

■ On the instant summary judgment motion, because it appears that defendant, the moving party, does not bear the burden of proof, defendant has a somewhat eased burden and plaintiff must produce evidence showing that a genuine issue of material fact remains in existence. The court finds that the plaintiff has presented sufficient evidence in the affidavits and the pleadings to demonstrate the existence of genuine issues of material fact still in dispute in the instant case. Among the genuine issues of material fact which appear to remain are different understandings of key terms included in the contract as well as different understandings as to the significance of clauses which were specifically omitted from the contract.

Although interpretation of the words included and excluded in a contract is, in general, a question of law, questions of fact can arise as part of the analysis. *D & S Universal Mining Co., Inc. v. United States*, 4 Cl.Ct. 94, 97 (1983). The intention of the parties controls the interpretation of a contract. In ascertaining the intention of the parties, the contract should be construed as an entirety "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680 (1975), *accord; Firestone Tire & Rubber Co. v. United*

---

**3.** The court also declines to take a position on the classification of plaintiff's claim at this stage of the proceedings, prior to the introduction of additional facts.

*States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971).

The language of a contract, moreover, must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965). The "unexpressed, subjective, unilateral intent of one party is insufficient to bind the other contracting party, especially when the latter reasonably believes otherwise." *Firestone*, 195 Ct.Cl. at 30, 444 F.2d at 551; *Singer–General Precision, Inc. v. United States*, 192 Ct.Cl. 435, 446–47, 427 F.2d 1187, 1193 (1970). Where, however, one party enters into a contract knowing or having reason to know the meaning put upon a provision by his opposite number, he is bound by that interpretation if it can be shown that his acquiescence can be demonstrated by silence, actual consent, or other actions clearly evidencing acquiescence to the other party's articulated understanding. *Lockheed Aircraft Corp. v. United States*, 192 Ct.Cl. 36, 44, 426 F.2d 322, 326 (1970); *Cresswell v. United States*, 146 Ct.Cl. 119, 127, 173 F.Supp. 805, 811 (1959). The conduct of the parties before the advent of controversy, thus, may be relied upon to discover the parties' underlying intention. *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed.Cir.1983), *cert. denied* 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983); *Macke Company v. United States*, 199 Ct.Cl. 552, 556, 467 F.2d 1323, 1325 (1972).

When a disagreement is presented to the court, the interpretation of words included in a contract is a two-step process. The court must determine first whether an ambiguity exists. *John C. Grimberg Co., Inc. v. United States*, 7 Cl.Ct. 452, 456, *aff'd*, 785 F.2d 325 (Fed.Cir. 1985). If an ambiguity is immediately apparent, it is sometimes referred to as a patent ambiguity, then the plaintiff is under a duty to seek clarification. *George E. Newsom v. United States*, 230 Ct.Cl. 301, 303, 676 F.2d 647, 650 (1982). Although a potential contractor may have some respon-

sibility to inquire about a major patent discrepancy, omission or conflicts in the provisions, he is not normally required to seek clarification of "any and all ambiguities, doubts or possible differences in interpretation." *WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1964) (disapproved on other grounds, *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 430–31 n. 6, 86 S.Ct. 1539, 1543 n. 6, 16 L.Ed.2d 662 (1966)). If the plaintiff, however, does not inquire about a clearly patent ambiguity, then the ambiguity will be construed against it. If, on the other hand, the ambiguity is not patent, then the non-patent ambiguity will be interpreted against the drafter of the contract, as long as the other party's interpretation is a reasonable one. *E.g., Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 316, 427 F.2d 722, 726 (1970). The alternative interpretation, however, must be within the "zone of reasonableness." *WPC Enterprises, Inc.*, 163 Ct.Cl. at 6, 323 F.2d at 877.

Where non-patent ambiguities exist, courts have traditionally allowed extrinsic evidence to be introduced in order to determine the intention of the parties at the time the contract was signed. For example, courts have allowed evidence of trade meaning, usage and custom to be employed to explain or define contract language, although though such evidence could not be used to vary or contradict contract language. *Gholson, Byars & Holmes Construction Co. v. United States*, 173 Ct.Cl. 374, 395, 351 F.2d 987, 999 (1965). Introduction of evidence of trade usage or custom has been allowed by the courts to show that "language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning." *Tibshraeny Bros. Const., Inc. v. United States*, 6 Cl.Ct. 463, 470 (1984) (citing *W.G. Cornell Co. of Washington, D.C., Inc. v. United States*, 179 Ct.Cl. 651, 376 F.2d 299 (1967)). Finally, where one party seeks to employ evidence of trade usage, summary judgment is inappropriate because trade usage is a "factual issue which must be proven." *D & S Universal*

*Mining Co., Inc. v. United States,* 4 Cl.Ct. 94, 97 (1983).

The portion of the contract which has been identified by both parties as at the center of the dispute, is Section F, Part II, section 8.1 and 8.1.1, which provides:

8.1 The Contractor shall provide the following services in Wells A and B prior to casing installation:

8.1.1 From a depth of approximately 15' into the caprock up to the 42" conductor pipe, run ISF/GR/FDC/SP/CNL & Sonic in Well A only.

The depth to the top of caprock will be determined by:

° a decline in the rate of drill bit penetration, and

° cuttings which contain anhydrite, limestone or gypsum.

Concurrence of these factors must be obtained from the Contracting Officer or his designated representative.

Defendant contends that under this provision, plaintiff was to make all relevant determinations in accordance with the contract and plaintiff was to bear the burden for any problems encountered. At oral argument on the instant motion, defendant stated that the contract was a turnkey project under which the plaintiff was obligated to drill for caprock and defendant's responsibility under the contract was merely to agree or disagree as to whether caprock had been reached. Defendant stated that while it confirmed whether caprock had been found in accordance with the terms of the contract, it was plaintiff's obligation to determine the appropriate location to place the casing shoe. In support of its position, defendant relies on the supposed plain meaning of the word "concurrence" in subsection 8.1.1 of the contract, which it says was intended to mean agree, and nothing more.

Plaintiff, however, contends that under this same provision of the contract, subsection 8.1.1, defendant had the duty to locate, identify and designate competent caprock, while plaintiff was required to follow defendant's designation of competent caprock when it set the casing shoe. Plaintiff takes the position that, in the industry, the term "concurrence", does not connote a partnership effort. Instead "concurrence" means that the government representative on the site designates the caprock and the contractor places the casing shoe in accordance with that determination. While defendant's argument also is based on its understanding of the plain meaning of the word "concurrence", plaintiff argues that its interpretation of Section 8.1.1 of the contract is also based on trade usage and practice in the industry.

In the instant case, it also is unclear whether at the time the contract was signed, plaintiff understood and acquiesced in defendant's understanding of the significance of the deletion of the differing site conditions clause from the general form contract.[4] Plaintiff's and defendant's understandings of the conduct of the parties before the advent of the controversy appear not to coincide, owing to disputes about the letter, which allegedly addressed deletion of the differing site conditions clause, and which defendant claimed it sent to interested bidders.

Defendant argues that the effect of the deletion was that plaintiff was to be responsible for all problems and costs arising from unforeseen subsurface conditions. Yet, it is interesting that in spite of this deletion, defendant attempts to classify the claim as a classic type I, differing site conditions claim. Defendant also claims that it sent a letter to all bidders explaining the effect of the deletion, but defendant cannot find the letter and plaintiff claims it never received any such letter. Plaintiff, on the other hand, contends that DOE did not advise bidders that deletion of the clause would result in the government's exculpation from all costs associated with lost circulation. Plaintiff further argues that the claim cannot be classified as a differing site conditions claim when there

---

**4.** It is important to remember that the parties agreed to delete the clause; the remaining question involves the effect of the deletion.

is no such clause in the contract. These disputes force the court to conclude that it should not rule on the legal effect of the deletion at this time, without further fact finding to clarify the intent of the parties.

In order to decide the motion for summary judgment, the court need not make a determination as to whether or not a contract term is ambiguous on its face. *See Gholson, Byars & Holmes Construction Co.*, 173 Ct.Cl. at 395 n. 13, 351 F.2d at 999 n. 13. While the court finds no patent ambiguity in subsection 8.1.1 of the contract, the court declines at this time to decide whether or not various contract terms are ambiguous and whether plaintiff or defendant ultimately should prevail as to their differing interpretations in this case. Moreover, in the instant case, the court finds that summary judgment is inappropriate because plaintiff seeks to employ evidence of trade meaning or custom, which is a factual issue.

The court finds that another genuine issue of material fact present in the instant case involves the sufficiency and timely presentation of appropriate notice regarding possible claims plaintiff intended to pursue as a result of problems encountered during performance. Defendant maintains that notice was untimely and that the late notice caused prejudice to the defendant. Plaintiff claims that notice was timely and sufficient and argues, therefore, that no prejudice could have been suffered by the government. Whether notice was timely depends in part upon the classification of plaintiff's claim. Different notification requirements control for different types of claims. Whether notice was timely also depends upon whether the government received constructive or actual notice prior to formal written notice. Plaintiff claims that the defendant knew of problems encountered at the site by the plaintiff, before formal written notice was given. Defendant contends it knew nothing of a possible claim until formal written notice was received. *See H.H.O. Company v. United States*, 12 Cl.Ct. 147 (1987).

The clearly established law on notice requirements provides that "a contractor's failure to adhere to the notice requirements of contract clauses can result in claims presented pursuant to said clauses being disallowed." *H.H.O. Co.*, 12 Cl.Ct. at 164 (citing *Jo–Bar Mfg. Corp. v. United States*, 210 Ct.Cl. 149, 156–57, 535 F.2d 62, 66 (1976); *Eggers & Higgins v. United States*, 185 Ct.Cl. 765, 785, 403 F.2d 225, 236 (1968); *Specialty Assembling & Packing Co. v. United States*, 174 Ct.Cl. 153, 179–80, 355 F.2d 554, 570 (1966); *see also Mingus Constructors, Inc. v. United States*, 10 Cl.Ct. 173, *aff'd*, 812 F.2d 1387 (Fed.Cir. 1987)).

■ In order to prevail in a case in which notice has not been provided on a timely basis by the contractor, the government has the burden of proving that the untimeliness caused prejudice to its case. *H.H.O. Co.*, 12 Cl.Ct. at 164; *Gulf & Western Industries v. United States*, 6 Cl.Ct. 742, 755 (1984).

■ The fact that the contracting officer is "aware of problems or contentions in performance is not the same as providing notice of a monetary claim against the government." *H.H.O. Co.*, 12 Cl.Ct. at 163 (citing *Gulf & Western Industries*, 6 Cl.Ct. at 750; *Mingus Constructors, Inc.*, 10 Cl.Ct. 173). Conversely, notice requirements should not be applied too technically, when the government is aware of the problems. *H.H.O. Co.*, 12 Cl.Ct. at 164. Notice requirements, moreover, are "subject to estoppel by an act of waiver depending on the facts of each case." *Roberts v. United States*, 174 Ct.Cl. 940, 952–53, 357 F.2d 938, 946–47 (1977); *H.H.O. Co.* at 164.

The *H.H.O. Co.* case provides guidance to the case at bar on several relevant issues. In *H.H.O. Co.*, plaintiff made claims under several sections of a contract: the "Changes," "Differing Site Conditions," "Suspension of Work," and "Damages for Delay" clauses, each of which had separate notice requirements. The court found that the plaintiff had not filed written equitable adjustment claims until after the time required by the various contract clauses had passed. The plaintiff in the case presented excerpts from daily diaries, letters and other materials, together with affidavits from

plaintiff's business manager, to show that the defendant had received actual or constructive notice of the events and argued that such notice should be considered sufficient to meet the notice requirements of the various contract clauses, without prejudicing the defendant. *H.H.O. Co.*, 12 Cl.Ct. at 163. In *H.H.O. Co.*, defendant argued that because the claims were not timely presented and caused prejudice to the government, they should be dismissed, *id.*, and that dismissal or summary judgment should be granted to the defendant. The *H.H.O. Co.* court evaluated the law and the facts and held that the plaintiff had submitted materials that raised questions as to whether the contracting officer was aware of the operating facts of each of the involved claims and whether his actions should be deemed a waiver of the notice requirements of the various contract clauses. The court, therefore, decided that dismissal or summary judgment was inappropriate in the case. *Id.* at 164.

In the case at bar, defendant's motion for summary judgment must fail for several reasons. In the first place, there is even confusion about the classification of plaintiff's claim, which the court cannot resolve without the introduction of additional facts. At this time, there also remain factual disagreements as to whether written notice of the claim was timely or untimely, although once plaintiff's claim is classified, it may be easier to resolve the timeliness question. If it is determined that formal notice was untimely, other contested notice issues will require factual resolution, such as whether defendant had actual or constructive notice and whether defendant waived notice requirements by any of its actions. Moreover, further, factual uncertainty remains regarding whether the government was prejudiced by plaintiff's actions, and if so, in what manner. Thus, there is genuine disagreement as to the effect of contract provisions, as to notice of problems encountered and as to which party had the responsibility to give notice and/or take actions to cure or mitigate potential damages.

Summary judgment in the instant matter could be denied based on the existence of one of the above genuine issues of material fact. The absence of consensus on all the factual issues discussed above, bolsters this court's conclusion that summary judgment is inappropriate in this case. For all of the reasons discussed above, defendant's motion for summary judgment is, hereby, denied.

IT IS SO ORDERED.