RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0185p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EAGLE SUPPLY AND MANUFACTURING, L.P.,

*Plaintiff-Appellee*,

*v.*

BECHTEL JACOBS COMPANY, LLC,

*Defendant-Appellant*.

No. 16-6428

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:10-cv-00407—Pamela Lynn Reeves, District Judge.

Argued: August 3, 2017

Decided and Filed: August 17, 2017

Before: SUTTON, McKEAGUE, and THAPAR, Circuit Judges.

---

## COUNSEL

**ARGUED:** Lochlin B. Samples, SMITH, CURRIE & HANCOCK, LLP, Atlanta, Georgia, for Appellant. Brian G. Corgan, KILPATRICK TOWNSEND & STOCKTON, LLP, Atlanta, Georgia, for Appellee. **ON BRIEF:** Lochlin B. Samples, Karl Frederick Dix, SMITH, CURRIE & HANCOCK, LLP, Atlanta, Georgia, for Appellant. Brian G. Corgan, Ian M. Goldrich, Reginald A. Williamson, KILPATRICK TOWNSEND & STOCKTON, LLP, Atlanta, Georgia, for Appellee.

---

## OPINION

---

THAPAR, Circuit Judge. During World War II, the United States launched the Manhattan Project—the military's effort to build the world's first atomic bomb. Building the

bomb was a big project. Cleaning up afterward turned out to be a big one, too. Since the mid-1980s, the Project's original uranium-enrichment facilities in Oak Ridge, Tennessee, have been inactive, and the Department of Energy ("DOE") has worked to clean up the hazardous waste left behind.

This case arises out of that cleanup. To manage its effort, DOE hired Bechtel Jacobs Company ("Bechtel"), a global engineering and construction firm. Bechtel, in turn, hired Eagle Supply & Manufacturing ("Eagle") to help decontaminate the complex. Circumstances changed, and litigation ensued. Now, years after the work finished, Eagle and Bechtel continue to fight over the payment owed for Eagle's work, over the meaning of certain contractual provisions, and even over what happened at the site. The district court found for Eagle, and Bechtel appealed. We now affirm the district court's award of damages and attorney's fees to Eagle, but remand so that the court can recalculate the interest to which Eagle is entitled under the Tennessee Prompt Pay Act.

I.

DOE hired Bechtel to clean up the uranium-enrichment site at Oak Ridge, with plans to convert the area into a commercial industrial park. That required not only the demolition of buildings and equipment across the 2,200-acre complex but also the careful removal of radioactive nuclear waste. After removing the waste, the team would need to decontaminate the soil and groundwater to ensure that the site would be safe for redevelopment. In short, the Oak Ridge project was a massive undertaking. Accordingly, Bechtel sought additional manpower and requested bids from potential subcontractors.

Eagle submitted one of those bids. Eagle relied on Bechtel's forecasts for the project but also factored in administrative costs and profit. As it turned out, one of Eagle's competitors submitted a cheaper bid, and another received a higher technical rating. But Bechtel determined that Eagle promised the right balance of merit and price. Bechtel also considered it "advantageous" that Eagle was a federally certified small business and a Historically Underutilized Business Zone contractor. Still Bechtel haggled after deciding that it would likely award the subcontract to Eagle. Bechtel convinced Eagle to accept a price reduction of over

$444,000, implying that Eagle would otherwise lose the bid. The two companies eventually agreed to a fixed-price subcontract for the full cost of performing the demolition and decontamination work.

Unfortunately, things did not go as planned. Soon after the work began, the parties realized that the project would be much more challenging and costly than they had anticipated. At the first set of facilities, Eagle discovered that it would need to remove a lot more sediment than expected. More sediment meant more employees. And to get more employees, Eagle had to reallocate employees from another area of the project. This staffing adjustment forced Eagle to abandon its original plan to tackle multiple areas simultaneously and resulted in delays and increased costs.

Shortly after the sediment setback, Bechtel announced a change to the security clearance requirements for the main facility at issue in this case—the K-1004-L facility. Workers at K-1004-L would now have to carry a higher security clearance and contend with an additional security perimeter. This caused two problems: (1) increased congestion meant the work took longer, and (2) increased security meant that Eagle had to hire new workers and subcontractors with the requisite security clearance. Not surprisingly, Eagle soon exceeded its projected costs.

The problems were not over. When Eagle began work on K-1004-L, it discovered substantial amounts of asbestos and fluorine gas. These unanticipated hazards sidelined Eagle's crews while the company hired remediation experts. And the new dangers meant more protective gear, which in turn slowed down Eagle's work.

Meanwhile, over an eight-month period, Bechtel made over sixty modifications to the subcontract's mandatory contractor procedures. These modifications affected nearly every aspect of Eagle's work—from environmental-health-and-safety requirements to personnel-change procedures. Apart from Bechtel's modifications, Eagle catalogued thirty-nine separate incidents of site conditions that differed from the initial forecast. All in all, Eagle's work proved significantly more challenging and expensive than either party had anticipated.

Changes happen—especially in long-term construction projects. Bechtel and Eagle planned for that eventuality by including a "Changes" provision in their contract (GC-18).

GC-18 allowed Bechtel to make changes. But if those changes caused Eagle's costs to increase, GC-18 required Bechtel to make appropriate "equitable adjustment[s]" in price and time for performance.

So when the changes occurred, Eagle requested equitable adjustments. Bechtel, however, dragged its feet on compensating Eagle for the overruns. When the financial burden became too great, Eagle objected to continuing the project. Bechtel, in turn, threatened to terminate Eagle, but ultimately agreed to pay Eagle's immediate labor and materials costs for the duration of the project. This preliminary payment only covered Eagle's labor and materials—not overhead, administrative expenses, or profit. So Eagle submitted another two requests for adjustment to its bid price to cover these outstanding expenses. Eight years after completing its work at K-1004-L—and still waiting to be paid for its requested price adjustments—Eagle filed this suit.

Eagle alleges breach of contract and seeks compensation for its extra work on the Oak Ridge project. Specifically, Eagle seeks damages for the two "Requests for Equitable Adjustment" that it submitted to Bechtel. The first addressed the additional costs that Eagle incurred at the K-1004-L site (the parties call this the "Combined Changes REA"). Bechtel conceded some equitable adjustment for these additional costs, but the parties were unable to settle upon an appropriate figure. The second request sought a price adjustment for excess waste that Eagle removed across the project (the parties call this "Waste Generation REA"). Bechtel contests liability for this excess waste.

The district court awarded Eagle the full amount of each request, plus interest and attorney's fees. Bechtel now appeals.

## II.

## A.

Both parties agree that some amount is due to Eagle for cost overruns at the K-1004-L site; the question is how much.[1] In general, a court's determination of the amount of an

---

[1] In its reply brief, Bechtel suggests for the first time that it "is relieved of liability" for the cost overruns at K-1004-L because Eagle failed to provide notice under SC-37. Reply Br. 8. Bechtel contends that SC-37 required Eagle to provide notice when the subcontract work reached 75% of allocated funds. But the reply brief contradicts

equitable adjustment is one of fact. *See United States v. Callahan Walker Constr. Co.*, 317 U.S. 56, 61 (1942). So we review an equitable adjustment for clear error, while we review any conclusions of law de novo. *Pressman v. Franklin Nat. Bank*, 348 F.3d 182, 185 (6th Cir. 2004). Moreover, where a district court's findings of fact involve credibility determinations about witness testimony, we accord even greater deference. *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985). Such a credibility finding, "if not internally inconsistent, can *virtually never* be clear error." *Id.* (emphasis added).

Here, the district court heard four days of testimony and combed through hundreds of exhibits before finding that Eagle was entitled to the full payment it requested. Among other evidence, the court relied upon payroll reports from Eagle's accounting system, copies of invoices for every payment Eagle now claimed, and equipment logs reflecting use and resulting charges. Substantial evidence in the record supported the district court's factual findings, and thus, the K-1004-L damages award was not clearly erroneous.

Bechtel insists that the district court's award was too large and that the court unduly relied on the testimony of two Eagle witnesses. Bechtel first complains that the court should have disregarded the testimony of an Eagle employee who was not involved in reconstructing the company's costs. But *who* prepared the estimates is not material to the court's holistic assessment of the amount due. Bechtel's next target is a competitor of Eagle—who, interestingly enough, testified on Eagle's behalf—and who Bechtel complains produced a "technically inferior" bid proposal. Why it matters that the competitor's proposal was "inferior" is anybody's guess. Just because Bechtel did not like the competitor's bid does not mean that its testimony is irrelevant or incorrect. Indeed, one thing is clear: A competitor has little incentive to overstate Eagle's costs. In any event, neither gripe demonstrates that the damages award was clearly erroneous.

---

Bechtel's statement in its opening brief that "Eagle provided notice pursuant to SC-37" for the K-1004-L work, and it is inconsistent with Bechtel's concession throughout this litigation that it owed *some* amount for these cost overruns. Appellant Br. 10; R. 166, PgID #1802. Regardless, Bechtel did not raise this argument until its reply brief, and thus it is waived. *Kuhn v. Washtenaw County*, 709 F.3d 612, 623 (6th Cir. 2013) ("This court does not usually consider issues raised for the first time on appeal in a reply brief, whether or not they were previously raised in the district court.").

Finally, Bechtel questions why the district court did not reduce the K-1004-L damages award to account for Eagle's "inefficiencies." According to Bechtel, (1) Eagle's subcontractor cross-contaminated the project with asbestos and (2) missing equipment delayed Eagle's work. And, Bechtel says, these mistakes increased Eagle's costs by 10%. But Bechtel's only evidence of cross-contamination is testimony from one Bechtel employee—and that testimony conflicts with another Bechtel employee's praise for Eagle's performance throughout the same incident. Yet another Bechtel employee contradicted the equipment-delay claim: He testified that, in each instance, alternate equipment was available or the absent equipment was unnecessary at that point in the project. The district judge was present for this evidence. She reached a conclusion based on it. And Bechtel's mere distaste for that conclusion does not make it clearly erroneous.

B.

Bechtel disclaims any liability to Eagle for excess waste on two grounds. First, Bechtel argues that Eagle did not give adequate notice that it was handling excess waste. Second, Bechtel challenges the district court's method of calculating the cost of the excess waste equitable adjustment.

*1. Notice*

In general, a subcontractor cannot bring an adjustment claim if it fails to adhere to a contractual notice requirement. *Big Chief Drilling Co. v. United States*, 15 Cl. Ct. 295, 303 (1988). But Bechtel has not identified any applicable notice requirement in the parties' subcontract. Sure, the provision on "Changes," GC-18, required Eagle to promptly request any equitable adjustment arising from a Bechtel-imposed change order. *See* Ex. J-1 (Subcontract) at 10 ("Subcontractor must assert its right to an adjustment under this clause in writing within 10 days from the date of receipt of the written order."). But the excess-waste adjustment request was not a response to a Bechtel-change order—it addressed cost overruns caused by higher-than-expected waste volumes at the work site. So GC-18 is out, and we are left without a clause in which to anchor Bechtel's notice requirement. This omission speaks volumes: Even Bechtel cannot find that obligation in the subcontract. Perhaps general principles of contract law might

have filled the gap; Bechtel just does not tell us how. Instead, it offers a conclusory assertion that Eagle breached an obligation that does not appear to exist; hardly a winning proposition.

Moreover, Bechtel must prove both that Eagle failed to provide timely notice *and* that Bechtel suffered prejudice as a result.[2] *Big Chief Drilling Co.*, 15 Cl. Ct. at 303. Bechtel says that Eagle's untimely notice prevented it from tracking the actual amount of waste Eagle removed and limited its options for minimizing the associated costs. But Bechtel refers to nothing in the record that supports either assertion. The burden of showing prejudice cannot be satisfied with such conclusory statements. It takes evidence. *Cf. Bowerman v. UAW Local No. 12*, 646 F.3d 360, 370 (6th Cir. 2011) (explaining that "[m]ere conclusory statements" do not satisfy a party's burden of proof). Bechtel provides none.

## 2. Calculation of Damages for Excess Waste

Bechtel also challenges the district court's method of calculating Eagle's excess-waste damages. Calculation of damages is a determination of fact, subject to "the discretion and good judgment of the fact finder as guided by the facts of the particular case." *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 606 (6th Cir. 1988) (citation omitted). We thus review damages awards for clear error. *Id.*

The district court failed to specify which method it used to calculate Eagle's damages for clearing excess waste. Courts generally have two options for calculating damages for equitable adjustments where the actual costs cannot be documented: the "total-cost" method and the "jury-verdict" method. *Cavalier Clothes, Inc. v. United States*, 51 Fed. Cl. 399, 417 (2001). Although the court did not specify its methodology, both parties addressed the total-cost method in their briefs. So we will too.

---

[2]Bechtel suggests that, for contracts (like this one) with limitation-of-funds clauses, the subcontractor bears the burden of proving that the contractor was not prejudiced by the untimely notice. The authority that Bechtel cites does not support its position. *Titan Corporation v. West* never mentions the prejudice requirement. 129 F.3d 1479 (Fed. Cir. 1997). And *International Science and Technology Institute, Inc. v. United States* discusses whether failure to provide notice can be excused if the government would likely have allowed the work to continue after receiving notice. 53 Fed. Cl. 798, 807 (2002). But Bechtel never suggests that the government (or Bechtel) would have directed Eagle to stop working, so this exception does not apply here. And the law is established that, outside of that exception, the burden of proving prejudice sits with the contractor. *See Big Chief Drilling Co.*, 15 Cl. Ct. at 303 (citing cases).

Under the total-cost method, damages are estimated according to "the difference between [the] total costs incurred in performance of the contract and [the] bid price." *Id.* Because this is only an approximation, courts "require[] four indicia of reliability to be present before a contractor may recover." *Id.* at 418. The plaintiff must prove that "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." *Id.* (citation omitted). Bechtel argues that Eagle came up short on each measure.

First, Eagle had to show that it is "impossible or highly impractical" to prove the actual amount of its losses. Throughout the project, Bechtel prescribed the waste-volume tracking procedures. Initially, those procedures did not require Eagle to record actual waste volumes, so Eagle did not. Later, Bechtel modified the procedures to require that Eagle track actual waste volumes, so Eagle did. As a result, when it came time to calculate damages, Eagle could only supply averages—not the actual volumes of waste that it removed throughout the project. Bechtel suggests that Eagle *theoretically* could have tracked its actual volumes by employing a different tracking method. But it is hard to fault Eagle for following the tracking procedures that Bechtel prescribed. The district court apparently did not. And neither will we.

Second, Eagle had to show that its original bid for the subcontract was realistic. The purpose of this factor is to prevent a subcontractor from "get[ting] the benefit of increased damages merely because it submitted an unreasonably low bid[.]" *Id.* Courts therefore assess whether a bid is realistic by comparing it with its competition. *Id.* Here, Eagle's bid was higher than the lowest—and slightly higher than the government's estimate for the project. It is true, as Bechtel notes, that Eagle relied on Bechtel's Waste General Forecasts, which Bechtel warned bidders were provided for informational purposes only. But Eagle's bid still fell comfortably within the range of its competitors'. It was therefore not unrealistic.

Third, Eagle had to show that its actual costs were reasonable. Eagle provided the district court with substantial evidence to support its costs, including affidavits from truck loaders, invoices, and employee timesheets. Bechtel challenges Eagle's calculation as "inherently inaccurate," because it relied in part on Eagle's previous visual estimates of waste volume.

Appellant Br. 47. But the district court needed only a "reasonable basis for computation," even if "approximate." *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1381 (Fed. Cir. 2004) (citation omitted). And the records Eagle provided were more than sufficient for that purpose. Bechtel's challenge is again little more than a disagreement with the district court's conclusion.

Finally, Eagle had to show that it was not responsible for the added expenses. The district court found that increased performance costs were solely attributable to changed site conditions, and it noted that one of Bechtel's own employees praised Eagle for overcoming those conditions. Bechtel, on the other hand, cites no evidence suggesting that Eagle contributed to the excess waste or the costs associated with it.

Neither of Bechtel's challenges to the excess-waste damages holds water. Substantial evidence supported the district court's award, and we have no reason to displace it now.

### III.

Along with the two equitable adjustments, the district court awarded Eagle interest and attorney's fees under the Tennessee Prompt Pay Act. Under the Prompt Pay Act, a court must award interest on overdue contractual payments. Tenn. Code. Ann. § 66-34-601. The Act also permits a court to award attorney's fees where one party acts in bad faith. *Id.* § 66-34-602(b). Bechtel challenges the district court's award of interest, the interest calculation, and the award of attorney's fees.

### A.

The Tennessee Prompt Pay Act requires a court to award interest on overdue payments under a contract. Tenn. Code. Ann. § 66-34-601. This interest accrues from the date the payment came due until the date the offending party finally pays up. *Id*. Bechtel challenges the interest rate that the district court applied. Unless a contract requires the use of a different rate, the Tennessee Prompt Pay Act instructs courts to apply the interest rate specified in Tennessee Code § 47-14-121. *Id*. Neither party disputes that the statutory interest rate applies here. But in the years between the formation of the parties' subcontract and the start of this litigation, Tennessee amended that rate. The question is therefore whether the original or amended rate

applies. We review this statutory-interpretation question de novo. *United States v. Parrett*, 530 F.3d 422, 429 (6th Cir. 2008).

From the time that the parties contracted until the commencement of this litigation, the statutory interest rate was 10%. Pre-amendment, the statute provided that "[i]nterest on judgments, including decrees, shall be computed at the effective rate of ten percent (10%) per annum, except as may be otherwise provided or permitted by statute[.]" Tenn. Code Ann. § 47-14-121 (1979). Tennessee amended the Prompt Pay Act in the middle of this litigation. Tenn. Code Ann. § 47-14-121 (2012). The amended statute created a new formula for calculating the applicable interest rate. Under the amended formula, the interest rate depends on the date of the judgment's entry. *Id.* § 47-14-121(a). The question here is how to determine the interest on claims that accrued in the pre-amendment period when judgment was entered in the post-amendment period. No Tennessee court has squarely addressed this question.[3]

In general, "statutes are presumed to operate prospectively and not retroactively." *Kee v. Shelter Ins.*, 852 S.W.2d 226, 228 (Tenn. 1993). But under Tennessee law, there is an exception to this general rule for procedural and remedial statutes. *Id*. Such statutes apply retrospectively both "to causes of action arising before such acts become law" and "to all suits pending when the legislation takes effect." *Id.* So if the Prompt Pay Act is remedial, it applies retrospectively.

Remedial statutes provide a "means or method whereby causes of action may be effectuated, wrongs redressed and relief obtained[.]" *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004) (quoting *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 958 (Tenn. Ct. App. 1996)). Simply put, remedial statutes provide a way to "redress injuries." *Black's Law Dictionary* (10th ed. 2014) (found within definition of "remedial statutes"). Here, the Act's interest provision falls under the statutory heading of "Remedies for Delinquent Payment or Nonpayment," suggesting that Tennessee legislators considered the provision to be remedial. Tenn. Code Ann. § 66-34-601. And the interest provision's purpose is to redress the wrong of

---

[3]Only one Tennessee case mentions the question of which interest rate applies when there is a post-amendment judgment concerning a pre-amendment contract. There, the trial court applied the post-amendment interest rate, reasoning that "allowance of prejudgment interest is an equitable measure to make the prevailing party whole." *Classical City Mech., Inc. v. Potter S. E., LLC*, No. E2015-01890-COA-R3-CV, 2016 WL 5956616, at *16 (Tenn. Ct. App. Oct. 14, 2016) (quoting from the trial court order). On appeal, however, the Tennessee Court of Appeals did not address whether the pre-amendment or post-amendment rate applied.

delayed payment and set out the method for obtaining relief.  So the Prompt Pay Act is properly read as remedial.

The district court therefore erred in applying the pre-amendment interest rate of 10%.  Since the district court entered judgment on August 19, 2016, the applicable interest rate should have been 5.5%.  *See* Tenn. Judgment Interest Rates, July 1, 2012 - July 1, 2017.

Eagle offers two responses.  First, Eagle argues it had a vested right in the pre-amendment interest rate.  While vested rights cannot be taken away retrospectively, *see Kee*, 852 S.W.2d at 228, Eagle provides no legal support for its claim that its right to collect the pre-amendment interest is a "vested right."  Nor have we found a Tennessee case suggesting that these types of "rights" can vest at all.

Second, Eagle believes that applying the amended Act retrospectively would be unjust.  Eagle offers no legal support for that argument.  Nor does Eagle explain why a 5.5% interest payment would not adequately redress the wrong of Bechtel's overdue payments.  Eagle is thus entitled to interest on both damages awards, but only at a rate of 5.5%.

B.

The Tennessee Prompt Pay Act also provides for the recovery of "[r]easonable attorney's fees" from a non-prevailing party who "has acted in bad faith."  Tenn. Code Ann. § 66-34-602(b).  A party acts in bad faith when it acts with "knowing or reckless disregard for contractual rights or duties."  *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 829 (Tenn. Ct. App. 2009).  The district court found that Bechtel acted with "knowing or reckless disregard" for Eagle's contractual rights and awarded Eagle attorney's fees.  We review this award for abuse of discretion but the underlying finding of bad faith for clear error.  *Griffin Indus., Inc. v. U.S. E.P.A.*, 640 F.3d 682, 686 (6th Cir. 2011).  Here, four grounds cited by the district court support the award.[4]

---

[4]In its bad-faith analysis, the district court relied in part on the parties' pre-contract negotiations.  R. 198, PgID #3058.  Bechtel argues that its behavior in negotiations preceding the existence of the subcontract cannot be relied upon as evidence of bad faith in its later contractual dealings.  Appellant Br. 50.  This argument need not detain us here, because the district court's determination was not clearly erroneous on the weight of the remaining evidence.

Ground one: The court found Bechtel's response to Eagle's requests for equitable adjustment to be "riddled with bad faith." R. 198, PgID #3059. Even after Bechtel acknowledged overruns of about $4.6 million at the K-1004-L site, Bechtel refused to pay Eagle, bickering over the precise allocation of responsibility. Eagle repeatedly responded to Bechtel's gripes with revised requests, only to have Bechtel demand that Eagle compile data differently or make additional revisions. Despite Bechtel's "nitpicking," its subcontract administrator admitted he admonished Eagle for failing to provide comprehensive data without even reviewing the documents that Eagle submitted.

Ground two: When Eagle tried to modify the subcontract to ensure payment for its out-of-scope work, Bechtel responded with a letter that the district court determined conveyed a thinly veiled threat of termination. Bechtel quibbles with the district court's reading of the letter. But the district court had a vantage point we do not; it had the ability to hear witnesses on both sides and see them testify. After the hearing, the district court agreed with Eagle—the letter contained a threat of termination. That determination was reasonable based on the testimony at the hearing. *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 674 (6th Cir. 2008).

Ground three: Bechtel assigned an employee to the project with the express task of reducing subcontractor costs by $100 million. This employee, Eugene Glasbergen, repeatedly interfered with Eagle's ability to do its work. Glasbergen held frequent meetings with Eagle's subcontractors without Eagle's knowledge or permission, causing confusion and tension. His antics so interfered with Eagle's ability to conduct its work and manage its own subcontractors that Eagle sent several formal notices to Bechtel objecting to his conduct. One of Bechtel's own employees testified that he had never witnessed someone treat a subcontractor the way that Glasbergen treated Eagle. At one point, Glasbergen even bragged that Eagle would not be paid "a dime" for cost overruns, and that, if he had his way, Eagle would end up paying Bechtel. R. 168, PgID #2111. The district court questioned Glasbergen's motives, noting that his compensation was directly tied to his ability to reduce Eagle's requests for equitable adjustment. Bechtel argues that the district court erroneously considered inadmissible testimony about Glasbergen when making these findings. But Bechtel did not object to the testimony, so Bechtel has waived that objection. *See United States v. Martin*, 757 F.2d 770, 771 (6th Cir. 1985).

Ground four:　In an episode that the district court described as the "most disturbing," Bechtel instigated a DOE investigation of Eagle by suggesting that Eagle had defrauded the government through overbilling.　R. 198, PgID ##3058-59.　The investigation required Eagle to respond to a grand jury subpoena and further delayed Eagle's efforts to collect from Bechtel. DOE ultimately declined to take any action against Eagle.　On appeal, Bechtel attempts to recast its failed arguments about facts in the record, suggesting that the district court misunderstood the events surrounding the DOE investigation.　But again, the district court heard the testimony and made a reasonable determination—one that was not clearly erroneous.

Bechtel offers still more attacks on the district court's finding of bad faith.　First, Bechtel suggests that it only refused to pay Eagle in order to comply with a government directive. During DOE's investigation into Eagle's allegedly fraudulent billing, the government issued a "Stop Payment Directive" that instructed Bechtel not to pay Eagle until further notice.　Bechtel now claims that this DOE directive remains in effect and that its failure to pay Eagle was therefore justified.　Bechtel ignores the fact that DOE issued this directive during its investigation into Eagle—an investigation that concluded years ago without any finding of wrongdoing.　Moreover, Bechtel has paid Eagle for other settled claims in the interim, contradicting its claim that it felt the government's stop-payment order prevented it from paying Eagle for its past work.

Second, Bechtel argues that the district court applied the wrong standard, finding mere "lack of good faith," instead of the requisite "bad faith."　Appellant Br. 49.　To be sure, the district court's order uses the phrase "lack of good faith."　But it also describes Bechtel's conduct as evincing "bad faith" three times, including once in a section header ("BJC's Acts of Bad Faith").　R. 198, PgID ##3058-59, 3068.　Read in context, the phrase "lack of good faith" is simply shorthand for "bad faith."

Finally, Bechtel argues that it was engaged in a dispute over the amount it owed to Eagle, and courts have said that such disputes are not themselves evidence of bad faith.　*See Sun Splash Painting, Inc. v. Homestead Vill., Inc.*, No. M2002-00853-COA-R3-CV, 2003 WL 22345482, at *2 (Tenn. Ct. App. Oct. 15, 2003).　Fair enough.　But it is how Bechtel conducted itself during

this dispute that led the district court to its finding of bad faith. A dispute over billing is not a license to treat the other side however you want.

In sum, Bechtel fails to demonstrate that the district court's finding of bad faith was clearly erroneous or that the district court abused its discretion in awarding attorney's fees to Eagle.

IV.

Finally, Bechtel offers two affirmative defenses to its nonpayment under the subcontract. Bechtel first argues that the subcontract contains a "pay-if-paid" provision conditioning its payment to Eagle on first receiving funds from the government. Bechtel also argues that Eagle failed to comply with the Truth in Negotiations Act's requirements for federal subcontractors. The district court correctly rejected both defenses.

A.

First, Bechtel argues that the subcontract includes a "pay-if-paid" provision, which required Bechtel to pay Eagle only if and when the government paid Bechtel. Pay-if-paid conditions shift the risk of nonpayment from the contractor to the subcontractor by requiring the subcontractor to wait for payment until the contractor has been paid. *Thos. J. Dyer Co. v. Bishop Int'l Eng'g Co.*, 303 F.2d 655, 661 (6th Cir. 1962). In legalese, pay-if-paid clauses are a type of condition precedent: One party is not obligated to perform until some condition is satisfied.

Both parties agree that Tennessee law governs our interpretation of the contract in this case. Tennessee has said little about pay-if-paid clauses, but some of its cases address a similar type of condition: "pay-when-paid." In form, there is a subtle difference. While pay-if-paid clauses say the contractor does not have to pay *unless* it is paid, pay-when-paid clauses delay the payment *until* the contractor is paid. Of course, practically they are the same: the contractor only pays the subcontractor when and if it receives payment. Thus, we anticipate that Tennessee would treat the clauses identically. And we know that Tennessee strongly disfavors pay-when-paid clauses, only enforcing such conditions when "there is clear language to support them." *Koch v. Constr. Tech., Inc.*, 924 S.W.2d 68, 71 (Tenn. 1996). Add the rule that the risk of

nonpayment normally lies with the prime contractor, *Dyer*, 303 F.2d at 661 (applying Ohio and Kentucky law), and Bechtel has a steep hill to climb.

A pay-if-paid clause seems simple enough to write: "I will not pay you unless and until I first get paid." And the subcontract here does contain some language that sounds like a pay-if-paid condition. For example, Clause GC-6 requires that Bechtel make payments "from funds advanced by the Government" and "not from its own assets." Ex. J-1 at 10. Likewise, SC-37 provides that Bechtel must perform its obligations only if the government first appropriates funds. *Id.* at 53-54. That provision further provides that Eagle may stop any work that would cause it to incur costs above the appropriated funds, rather than continuing on "at its own risk." *Id.* at 54.

In context, however, both provisions are ambiguous. The relevant language of GC-6 is sandwiched between two sentences that describe the process by which the government can assume the subcontract from Bechtel. *Id.* at 10. The position of this language makes it unclear whether this condition applies to the entire contract or is triggered only if the government assumes the subcontract. And although SC-37 contains some language suggesting conditionality, it mentions neither DOE nor the government generally—only Bechtel's obligations under the subcontract. Plus, Bechtel seeks to establish an unambiguous pay-if-paid provision by combining isolated clauses from disparate sections of the contract. That is not the natural way to read this. We therefore cannot say that GC-6 and SC-37 are "clear," *Koch*, 924 S.W.2d at 71, or "express," *Dyer*, 303 F.2d at 661—let alone "unambiguous," as Bechtel claims.

Even if GC-6 and SC-37 contain some conditional language, the subcontract's provision on "Invoicing and Payment," SC-15, does not. Ex. J-1 at 41-43. This provision lists several situations under which Bechtel can withhold payment, but the exceptions do not include unavailability of funds or nonpayment by the government. *Id.* If the subcontract contains a pay-if-paid condition, it seems odd not to mention it in the clause specifically addressing payment. Furthermore, SC-15 explicitly creates a different "condition precedent" that requires Eagle to waive claims against Bechtel prior to being paid. *Id.* at 42. The fact that the parties relied on the phrase "condition precedent" there indicates that they knew how to create an explicit condition

precedent when they wanted to. So if the parties had intended to condition Eagle's payment on the government's appropriation of funds, they could have made that intention clear.

Bechtel argues that SC-15 "has no bearing on the current dispute" because Eagle did not invoice its two equitable adjustment requests. Reply Br. 11. Bechtel contends that SC-15 would have become operative only if the parties had agreed upon a price, DOE had provided funding, and Eagle had submitted an invoice. But even if SC-15 was not implicated here, the provision is still relevant for interpretive purposes. This court must construe the parties' contract as a whole. *In re Baxter*, 104 F.2d 318, 320 (6th Cir. 1939) ("It is a settled rule in the construction of a contract that the interpretation must be upon the entire instrument. It cannot be disjointed or particular parts separated from the balance[.]"). So SC-37 and GC-6 must be read against the backdrop of the entire subcontract, which includes SC-15.

Regardless, this court has made clear that pay-if-paid conditions require absolute precision of language. In *Dyer*, the contract provided that "no part of [the price to be paid to Subcontractor] shall be due until five (5) days after Owner shall have paid Contractor therefor[.]" 303 F.2d at 656 (internal quotation marks omitted). That language was more explicit than the subcontract here, yet this court determined that it was not "express" enough to create a pay-if-paid condition. *Id.* at 661. If *Dyer*'s language was insufficient, the provision here proves even more so.

Read as a whole, the subcontract is unclear as to how it allocates the risk of nonpayment. And under Tennessee law, ambiguity must be construed against Bechtel, the undisputed drafter of the subcontract. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006). Thus, the district court rightly concluded that the subcontract contains no pay-if-paid condition.

B.

Bechtel also defends its nonpayment by arguing that Eagle failed to comply with the federal Truth in Negotiations Act. Specifically, it suggests that Eagle failed to provide current, complete, and accurate data at all times through trial and subsequent briefing.

The Truth in Negotiations Act requires federal contractors and subcontractors to make full disclosure to the government during negotiations.  Bechtel argues that Eagle violated these disclosure requirements by failing to submit a signed "Certificate of Current Cost or Pricing Data" to Bechtel when Eagle sought an adjustment to the subcontract.  Reply Br. 12.  Indeed, the Act requires subcontractors to "submit cost or pricing data before the pricing of a change or modification to [a] subcontract[.]"  41 U.S.C. § 3502(a)(4).  But the subcontractor needs to *certify* the data "[a]s soon as practicable *after* agreement on price[.]"  48 C.F.R. § 52.215-20(b)(2) (emphasis added).  In other words, the certification requirement does not apply until after the parties conclude negotiations and reach a price agreement, 48 C.F.R. § 15.406-2 n.**, as Bechtel concedes, Reply Br. 13.  The record shows that Eagle and Bechtel never reached an agreement on either of Eagle's equitable adjustment requests.  So Eagle could not have violated the Act—the certification rule did not apply yet.

Bechtel also argues that Eagle's revisions to its equitable adjustment requests are evidence of its noncompliance with the Act.  But the district court found that Eagle provided most of these revisions in response to Bechtel's "nitpicking"—"nitpicking" that Bechtel offered without reading Eagle's initial requests.  R. 198, PgID #3053.  Bechtel cannot spin the revisions it requested—and that Eagle provided in an effort to cooperate—into evidence that Eagle flouted a federal disclosure law.  Thus, Bechtel has failed to show that Eagle violated the Truth in Negotiations Act.

V.

For the foregoing reasons, we affirm in part and reverse in part.  We affirm the district court's damages award, as well as the award of attorney's fees, but remand for the district court to recalculate the interest owed to Eagle.